UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JENNI ELLIS,

                    Plaintiff,

        v.

PIERCE COUNTY, by and through
PIERCE COUNTY SHERIFF'S
OFFICE, LEVI REDDING AND JANE
DOE REDDING, and JOHN/JANE
DOES 1–5,

                    Defendants.

CASE NO. C22-5142 BHS

ORDER

        This matter is before the Court on Defendants Levi Redding[1] and Pierce County's

motion for summary judgment,[2] Dkt. 72, and Plaintiff Jenni Ellis's motion for partial

summary judgment, Dkt. 73.

        This is the fourth dispositive motion filed by Redding and Pierce County in this

case. *See* Dkts. 12, 20, 36. The Court denied each of those prior motion insofar as they

---

        [1] Both Levi Redding and Jane Doe Redding are defendants in this case. For concision, the
Court refers them collectively as "Redding."

        [2] Ellis requests oral argument on Redding and Pierce County's motion for summary
judgment. Dkt. 82 at 1. This request is **DENIED**.

ORDER - 1

1  sought to dismiss Ellis's excessive force, negligence, and vicarious liability claims. *See*

2  Dkts. 34, 20. The Court reaches the same decision today. Because genuine issues of

3  material fact remain as to each of these claims, Redding and Pierce County are not

4  entitled to judgment as a matter of law. This case will proceed to trial.

5  ## I.    BACKGROUND

6  Shortly before midnight on March 11, 2019, Pierce County Sheriff's Deputies

7  Aaron Wolfe, Erik Haney, and Jason Youngman responded to a domestic dispute call

8  from Ellis's boyfriend, Eric Vankirk. Dkt. 65-1 at 3; Dkt. 64-3 at 7. When they arrived at

9  Vankirk's residence, Vankirk informed them that he and Ellis had an argument after

10  Vankirk asked Ellis "to move over in their bed." Dkt. 67-1 at 6. Ellis, who was

11  intoxicated, refused and yelled at Vankirk. Id.; Dkt. 17 ¶ 5. Vankirk moved to the couch,

12  but Ellis followed him, Dkt. 67-1 at 6, and ultimately "punched him in the left eye." Dkt.

13  67-1 at 6. Vankirk's son, Devon,[3] informed the deputies that Ellis also "punched" him "in

14  the face . . . when he tried to brake [sic] up the two arguing adults." *Id.* At the time,

15  Devon was 16 years old. Dkt, 67-1 at 4.

16  According to Haney's incident report, "[b]oth Eric and Devon" had "redness on

17  their left eyes" and Haney "could see some redness that looked to be a fresh markings

18  [sic]." Dkt. 67-1 at 6. Haney's incident report described the injuries sustained by both

19  Vankirk and Devon as "Apparent Minor Injury/Complaint of Minor Pain." Dkt. 67-1 at

20  4–5.

21

22  [3] To avoid confusion, the Court refers to Vankirk's son by his first name only.

Haney took the following photographs of where Ellis had hit their faces:



Dkt. 16 at 31, 34.

Haney determined that probable cause existed to arrest Ellis for two counts of assault in the fourth degree, domestic violence, which is a gross misdemeanor. Dkt. 67-1 at 6; Dkt. 80-7 at 14; *see also* RCW 9A.36.041.

Vankirk and Devon told the deputies that Ellis "had left on foot less than ten minutes earlier" and that she "was wearing a black jacket, black leggings, and slippers." Dkt. 67-1 at 6. Devon also informed the deputies that Ellis left the house carrying a "bottle of alcohol." Dkt. 64-2 at 23; *see also* Dkt. 64-3 at 4.

Haney then "requested for K9 assistance and a perimeter to be set up to locate [Ellis]." Dkt. 67-1 at 6. Shortly after midnight, Redding arrived with a canine, Zepp. Dkt. 69-1 at 3.

Redding spoke to Wolfe, Haney, and Youngman who "collectively informed" Redding that probable cause existed to arrest Ellis for two counts of assault in the fourth degree, domestic violence. *Id.* They also informed Redding that Ellis was "approximately

5'-05" tall wearing a black jacket, black leggings and slippers" and that "[s]he was last seen going out the front door with a bottle of alcohol."[4] *Id.* Redding then "spoke with one of the victims of the assault" and "learned that this type of incident has occurred before, and last time [Ellis] returned to the residence later in the day." *Id.*

Redding decided to use Zepp to locate Ellis. Dkt. 69-1 at 3. Redding "believed that if not found and apprehended [Ellis] would come back to the residence and possibly further assault the victims." *Id.* Redding "note[d] that it was substantially raining at the time and [Ellis]'s clothing description was not suitable for the weather which only added to [his] belief she would return." *Id.*

Redding announced that Ellis "was under arrest for domestic assault and the she needed to give up." Dkt. 69-1 at 3. He also announced, "a few times," that "the area was going to be searched by a police canine and that if she did not give up the dog would find her and possibly bite her." *Id.* Ellis did not respond to these announcements and, rather, denies ever hearing them. *Id.*; Dkt. 64-7 at 8. Redding then placed a 30-foot-long leash on Zepp's harness and commenced the search. Dkt. 69-1 at 3. Youngman accompanied Redding during this search. Dkt. 68, ¶ 1.

Several minutes later, Ellis telephoned Devon. Dkt. 64-7 at 9. Devon turned on his speakerphone so that Wolfe and Vankirk could hear the conversation. *See* Dkt. 64-3 at 16. Devon informed Ellis that the police were searching for her. *See* Dkt. 64-3 at 17; 65-1

---

[4] During his deposition, Devon testified that, before Ellis left the residence, she "grabbed, like, a fifth of vodka, and then ran outside." Dkt. 64-3 at 3. The record is not clear as to whether any of the deputies, including Redding, knew the exact type of bottle that Ellis was carrying when she left the residence.

at 3. Ellis repeated "several times" that she could not believe that Vankirk had notified

the police. Dkt. 64-3 at 17. Ellis also informed Devon that an "Uber" had picked her up

and that she was going to her mom's house. *Id.* at 16. Devon does not recall whether he

or Ellis ended the conversation. *Id.*

Wolfe determined that Ellis was intoxicated because she slurred her speech and

used repetitive language. Dkt. 65-1 at 3. At no point during the conversation did Wolfe

attempt to speak directly to Ellis to inform her of the situation and encourage her to return

to the residence so as to avoid the use of a police canine. *See* Dkt. 64-1 at 8–9; Dkt. 64-3

at 15–17.

Wolfe informed Redding of this telephone call, but Redding did not believe that

Ellis had left the area in an Uber. *See* Dkt. 64-5 at 30–31, 37, 39. He accordingly

continued to use Zepp to search for Ellis. Zepp started to display "extreme positive

indicators" in the front yard of Vankirk's residence. Dkt. 64-5 at 29. After Zepp

displayed such "indicators," Redding, curiously, did not announce any additional

warnings to Ellis. Dkt. 64-5 at 29–30.

Zepp then "neared a row of tall arborvitaes that separated [Vankirk]'s residence

from his neighbors." Dkt. 69-1 at 3. Redding recalls that Zepp, "without having been

given a command to do so, darted out of his sight and [Redding] ran around the corner of

a line of arborvitaes that bordered Vankirk's property to find Ellis hiding under a boat

[trailer] in the dark next to the vegetation while being contacted by []Zepp." Dkt. 69, ¶ 3.

Redding later clarified that, by saying that Ellis was "being contacted by []Zepp," he

1  meant that Zepp was biting and pulling on Ellis's arm while attempting to drag her out

2  from underneath the boat trailer. *See* Dkt. 64-5 at 23.

3       Redding did not command Zepp to stop. He instead "allowed" Zepp to continue

4  biting and pulling on Ellis. Dkt. 64-5 at 23–24. Redding claims that he allowed Zepp to

5  continue doing so because he "couldn't see her hand" and "didn't know if she had

6  anything in her hands." *Id.* at 27–28. Zepp was biting and pulling on Ellis's left arm

7  while Ellis was attempting to fend Zepp off with her right hand. *See* Dkt. 16 at 35–37;

8  Dkt. 69, ¶ 5; Dkt. 64-4 at 5. Redding testified that he gave Ellis "repeated commands to

9  let go of []Zepp and show [him] her hands" and that she "did not comply." Dkt. 69, ¶ 5.

10       Redding subsequently "grabbed [Ellis]'s arm and pulled her out from beneath the

11  boat and was assisted in this by []Zepp who spontaneously helped pull her out in the

12  same direction." Dkt. 69, ¶ 5. Ellis testified that Zepp "clearly had a huge grip and was

13  . . . tearing, like a ripping motion because [Zepp] was dragging" her. Dkt. 64-7 at 20.

14       When Redding claims to have determined that "[Ellis's] hands were empty," he

15  "immediately straddled []Zepp and grabbed his harness." Dkt. 69, ¶ 5. After straddling

16  Zepp, Redding "commanded []Zepp to release Ellis and upon his release [Redding]

17  immediately pulled him away by his harness some distance from [Ellis]." *Id.*

18       Approximately 25 to 30 seconds elapsed between the time Redding first reported

19  to Wolfe and Haney that Zepp was biting Ellis and the time Redding ultimately removed

20  Zepp from her. *See* Dkt. 65, ¶ 4. Wolfe and Haney subsequently placed handcuffs on

21  Ellis. Dkt. 64-4 at 6.

22

After transporting Ellis to the hospital, Haney took the following photographs of Ellis's injuries:

 

Dkt. 16 at 35–37.

Ellis sued Redding and Pierce County, alleging three causes of action: a § 1983 claim against Redding for violating her Fourth Amendment right to be free from unreasonable seizure; a *Monell* claim against Pierce County for having a policy, custom, or practice of failing to adequately train, supervise, or communicate to its officers regarding the constitutional use of police canines; a negligence claim against Redding; a negligence claim against Pierce County; and a vicarious liability claim against Pierce County. *See* Dkt. 1, ¶¶ 5.1–6.8.

Pierce County moved to dismiss the *Monell* claim and vicarious liability claim under Federal Rule of Civil Procedure 12(b)(6). Dkt. 12. Redding then moved to dismiss the excessive force and negligence claims against him under Rule 12(b)(6). Dkt. 20. He also moved for summary judgment on the negligence claim. *Id.* The Court denied Redding's motions. Dkt. 34. The Court also denied Pierce County's motion to dismiss the vicarious liability claim. *Id.* However, the Court granted Pierce County's motion to

1    dismiss the *Monell* claim, dismissing that claim without prejudice and granting Ellis

2    leave to amend the complaint. *Id.* at 4–17.

3          Ellis amended the complaint, adding new allegations related to her *Monell* claim.

4    Dkt. 35, ¶¶ 3.7, 5.4. Pierce County again moved to dismiss this claim, Dkt. 36 at 2–9, and

5    the Court granted that motion. Dkt. 40 at 3–7. Pierce County also moved to dismiss any

6    "direct negligence" claim against it, Dkt. 36 at 14–16, and the Court also granted that

7    motion. Dkt. 40 at 7–9. Redding moved again to dismiss the negligence claim against

8    him under Rules 12(b)(6) and 56. Dkt. 36 at 9–14. The Court denied those motions. Dkt.

9    40 at 9–15.

10         Redding yet again moves for summary judgment, this time on both the excessive

11   force claim and the negligence claim. Dkt. 72 at 12–25. Pierce County also moves for

12   summary judgment on the vicarious liability claim. *See id.* at 25. Ellis opposes these

13   motions.[5] Dkt. 82.

14         Ellis also moves for a partial summary judgment determination that (1) her injuries

15   were caused by Zepp, (2) her emergency medical treatment for those injuries was

16   reasonable and necessary, (3) her medical expenses for this treatment were reasonable

17   and customary for the type of treatment provided, and (4) Redding and Pierce County's

18

19   ───────────────
          [5] Redding and Pierce County's reply brief contains a motion to strike a report drafted by
20   Ellis's expert witness, Kyle Heyen. Dkt. 86 at 7–10. Because reference to this report is
     unnecessary to resolve their motion for summary judgment, this motion is **DENIED**. This ruling
21   does not preclude Redding and Pierce County from filing a motion in limine concerning this
     report. Even so, based upon the terse and incomplete briefing on the subject, the Court views it
22   unlikely that Heyen's testimony will be excluded (at least insofar as he does not render opinions
     as to the ultimate conclusion of whether Redding's conduct was objectively reasonable).

affirmative defense of "provocation" to the negligence claim fails as a matter of law. Dkt. 73 at 1. This motion is largely unopposed, but Redding and Pierce County assert that they are entitled to assert a provocation defense. Dkt. 78 at 1–3, 6–9.

Furthermore, in their response brief to Ellis's motion for partial summary judgment, Redding and Pierce County request a summary judgment determination that Ellis's "claims for future medical treatment, permanent injuries, and past and future loss of income" fail as a matter of law. Dkt. 78 at 6. Ellis opposes this request. Dkt. 83 at 1–2.

The parties' arguments are addressed below.

## II.   DISCUSSION

### A.   Summary Judgment Standard.

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52. The moving party bears the initial burden of showing that there is no evidence which supports an element

1    essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

2    Once the movant has met this burden, the nonmoving party then must show that there is a

3    genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to

4    establish the existence of a genuine issue of material fact, "the moving party is entitled to

5    judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

6         There is no requirement that the moving party negate elements of the non-

7    movant's case. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Once the moving

8    party has met its burden, the non-movant must then produce concrete evidence, without

9    relying merely on allegations in the pleadings, that there remain genuine factual issues.

10   *Anderson*, 477 U.S. at 248.

11   **B.     Redding's argument that Zepp's act of biting Ellis did not amount to a
     Fourth Amendment seizure is meritless.**

12        Redding first argues that Zepp's act of biting Ellis does not qualify as a seizure

13   under the Fourth Amendment because Redding subjectively intended for Zepp to merely

14   search for Ellis, not bite her. Dkt. 72 at 13, 15–17. He asserts that "[t]he evidence is

15   undisputed the *leashed* []Zepp unexpectedly darted out of his handler's sight, without

16   Deputy Redding's foreknowledge or command, to bite Ellis who was hiding under the

17   boat where she had not been moments before and where at the time she was not expected

18   to be." *Id.* at 15. Redding claims that, therefore, no Fourth Amendment seizure occurred

19   "[a]s a matter of law" because "'government action must be intentional to establish a

20   seizure within the meaning of the Fourth Amendment.'" *Id.* (quoting *Edmiston v. City of*

21

22

1  *Port Angeles*, 360 F. Supp. 3d 1147, 1152 (W.D. Wash. 2018)). This argument is

2  unpersuasive even under Redding's own recollection of the incident.

3      The Fourth Amendment provides that "[t]he right of the people to be secure in

4  their persons, houses, papers, and effects, against unreasonable searches and seizures,

5  shall not be violated." U.S. CONST., amend IV. "A seizure requires the use of force *with*

6  *intent to restrain*. Accidental force will not qualify. Nor will force intentionally applied

7  for some other purpose satisfy this rule." *Torres v. Madrid*, 592 U.S. 306, 317 (2021).

8  "Moreover, the appropriate inquiry is whether the challenged conduct *objectively*

9  manifests an intent to restrain, for we rarely probe the subjective motivations of police

10  officers in the Fourth Amendment context." *Torres*, 592 U.S. at 317.

11      Redding's declaration states that, "without having been given a command to do

12  so," Zepp "darted out of [Redding's] sight and [Redding] ran around the corner of a line

13  of arborvitaes that bordered Vankirk's property to find Ellis hiding under a boat in the

14  dark next to the vegetation while being contacted by []Zepp." Dkt. 69, ¶ 3. However,

15  Redding does not dispute that, *after* he first saw Zepp biting Ellis, he intended for Zepp to

16  continue biting her. Redding testified that he "allowed" Zepp to continue biting and

17  pulling on Ellis. Dkt. 64-5 at 23–24. Instead of commanding Zepp to stop, Redding gave

18  "repeated commands" to *Ellis* "to let go of []Zepp and show [Redding] her hands." Dkt.

19  69, ¶ 5. Redding subsequently "grabbed [Ellis]'s arm and pulled her out from beneath the

20  boat *and was assisted in this by* []*Zepp* who spontaneously helped pull her out in the

21

22

1   same direction."[6] Dkt. 69, ¶ 5 (emphasis added). Only when Redding claims to have

2   determined that "[Ellis's] hands were empty" did he "straddle[] []Zepp and grab[] his

3   harness." Dkt. 69, ¶ 5. After doing so, Redding "commanded []Zepp to release Ellis and

4   upon his release [Redding] immediately pulled him away by his harness some distance

5   from [Ellis]." *Id.*

6       Redding's conduct after he first saw Zepp biting Ellis objectively manifested an

7   intent to have Zepp restrain her. Redding's argument to the contrary defies reason and

8   common sense. It is of no consequence that Redding claims that he initially intended for

9   Zepp to merely search for Ellis without biting her. He objectively intended for Zepp to

10  continue restraining Ellis by biting, holding, and pulling on her body. This alone amounts

11  to a Fourth Amendment seizure.

12      Furthermore, Redding's refusal to immediately command Zepp to stop biting

13  Ellis—particularly when he claims that he did not initially intend for Zepp to bite her at

14  all—raises a factual question as to whether his conduct objectively manifested an intent

15  for Zepp to bite Ellis in the first instance.

16      Redding is therefore not entitled to judgment as a matter on this issue.

17  **C.   Genuine issues of material fact prevent summary judgment dismissal of
    Ellis's excessive force claim.**

18      Redding similarly argues that Ellis's excessive force claim fails because he

19  deployed Zepp to merely search for and locate Ellis, not bite her. Dkt. 72 at 13. He also

20

21  _____

22      [6] There is no development in the record as to whether Redding's use of Zepp to pull Ellis
    out from underneath the trailer was a legitimate use of a police canine.

asserts that, "[u]pon rounding the corner and seeing Zepp contacting Ellis, the Constitution did not require Zepp be immediately recalled." *Id.* at 19. Redding claims that Ellis posed an immediate threat to the safety of the officers, Vankirk, and Devon because she left Vankirk's residence carrying a bottle of alcohol and, on a prior occasion, she had returned to Vankirk's residence to "attack" him again. *Id.* at 14. Redding next argues that the severity of the crimes at issue warranted the use of a police canine because a Washington statute required him to arrest her. *Id.* at 14. Redding further contends that he reasonably believed that Ellis was "actively attempting to escape" when he deployed Zepp to search for her. *Id.* at 14.

Ellis responds that genuine issues of material fact prevent the summary judgment dismissal of her excessive force claim. She contends that she did not pose a threat to anyone's safety and a reasonable officer would not have feared for his or her safety simply because Ellis might have possessed a bottle of alcohol. Dkt. 82 at 23. Ellis also asserts that the crimes at issue did not warrant the use of a police canine because they were misdemeanors and the injuries she inflicted on Vankirk and Devon were minor. *Id.* at 10, 22. She further argues that fact issues exist as to whether she was attempting to evade arrest by flight because she was unaware that Vankirk had even telephoned the police when she initially departed the residence. *Id.* at 22.

"Excessive force claims are founded on the Fourth Amendment right to be free from unreasonable seizures of the person." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017) (citing U.S. CONST. amend. IV; *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)). "The Fourth Amendment is implicated where an officer exceeds the

1    bounds of reasonable force in effecting an 'an arrest, investigatory stop, or other

2    seizure.'" *Shafer*, 868 F.3d at 1115–16 (quoting *Graham*, 490 U.S. at 395–96). Courts

3    "analyze excessive force claims according to the constitutional touchstone of objective

4    reasonableness, so [they] do not consider an officer's subjective 'intent or motivation.'"

5    *Shafer*, 868 F.3d at 1116 (quoting *Graham*, 490 U.S. at 397). Courts also "judge

6    reasonableness of the force 'from the perspective of a reasonable officer on the scene,

7    rather than with the 20/20 vision of hindsight.'" *Shafer*, 868 F.3d at 1116 (quoting

8    *Graham*, 490 U.S. at 396). This is "because 'officers are often forced to make split-

9    second judgments—in circumstances that are tense, uncertain, and rapidly evolving—

10   about the amount of force that is necessary in a particular situation.'" *Shafer*, 868 F.3d at

11   1116 (quoting *Graham*, 490 U.S. at 397).

12          "This determination requires [courts] to balance the 'nature and quality of the

13   intrusion on the individual's Fourth Amendment interests against the countervailing

14   governmental interests at stake.'" *Shafer*, 868 F.3d at 1116 (*Graham*, 490 U.S. at 396). In

15   so doing, courts consider "the facts and circumstances of each particular case, including

16   the severity of the crime at issue, whether the suspect poses an immediate threat to the

17   safety of the officers or others, and whether he is actively resisting arrest or attempting to

18   evade arrest by flight." *Id.* at 397. "[T]he most important single element of the three

19   specified factors" is "whether the suspect poses an immediate threat to the safety of the

20   officers or others." *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).

21

22

1    **1.    Genuine issues of material exist as to whether Ellis posed an immediate threat to the safety of the officers or others.**

Most importantly, a fact issue exists as to whether Ellis posed an immediate threat to the safety of the officers or others. Redding argues that Ellis posed an immediate threat of harm because she: (1) "had previously committed similar domestic violence against the same victim both with and without a weapon," (2) "had in the past returned after a DV call to attack that victim again," (3) "was reported to have left carrying a bottle of alcohol that could be used as a bludgeon to the head as she had done to Vankirk just three months before," and (4) "was found lurking in the dark just a 25-30 second run from [Vankirk's] front door." Dkt. 72 at 14.

Redding testified that, before deploying Zepp, he "learned that [Ellis] had -- there were previous incidents where she had assaulted the victim and come back." Dkt. 64-5 at 5. Redding did not testify to having any further knowledge of these incidents. To the contrary, when asked whether "there [was] anything that we haven't covered that [he] recall[ed] in [his] conversations with the deputies when [he] first arrived," Redding responded, "No." *Id.* at 6. Accordingly, any other details of these prior incidents— including whether Ellis had previously "bludgeon[ed]" Vankirk or returned to "attack" Vankirk after he had reported an incident of domestic violence to the police—are irrelevant to Ellis's excessive force claim. *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019) ("Only information known to the officer at the time the conduct occurred is relevant" to an excessive force claim under the Fourth Amendment). Viewed in Ellis's favor, the mere fact that Redding knew that, on prior occasions, Ellis had

1    returned to the residence sometime after assaulting Vankirk does not demonstrate that she

2    posed an immediate threat of harm to Vankirk, Devon, the officers, or anyone else.

3          A factual question also exists as to whether Ellis posed an immediate threat to the

4    safety of Vankirk or Devon after she left Vankirk's residence and once the deputies had

5    already arrived. While Redding searched for Ellis, Wolfe remained inside Vankirk's

6    residence with Vankirk and Devon.[7] *See* Dkt. 64-1 at 8–9; Dkt. 65-1 at 3. A reasonable

7    jury could accordingly find that Ellis did not have access to Vankirk and Devon and, in

8    turn, that she did not pose *any* threat to their safety when Redding commenced his search.

9          The Court also declines to rule as a matter of law that a reasonable officer would

10   have feared that Ellis would attempt to "bludgeon" Redding to the head with the bottle of

11   alcohol that she was carrying when she left Vankirk's residence. Redding testified that he

12   "had known that [Ellis] left with an alcohol bottle," Dkt. 64-5 at 24, that "alcohol . . .

13   makes people irrational and dangerous," *id.*, and that "a glass bottle can be used as a

14   weapon." *Id.* at 40. But a jury could find that a reasonable officer would have believed

15   that Ellis left Vankirk's residence with the bottle of alcohol simply because she had been

16   consuming alcohol and for no other purpose. Redding's own testimony that he initially

17   intended for Zepp to merely search for, and *not* bite, Ellis supports such a finding. *See*

18   Dkt. 69, ¶ 6 ("I at no time gave []Zepp a command to bite [Ellis] but only to search for

19   her and later to release her."). This raises a factual question as to whether the bottle posed

20   *any* threat to Redding's safety, let alone an immediate one.

21   _____

22        [7] The record is not clear as to whether Haney also remained inside the residence during this time. *See* Dkt. 64-1 at 7; Dkt. 64-6 at 6.

A reasonable jury could also find that, *after* Zepp had already located Ellis, she did not present an immediate threat to anyone's safety. Redding testified that he allowed Zepp to continue biting Ellis because he "didn't know if she had anything in her hands" and he was "not going to call the dog off until [he] can deem that it's safe for [him]self or other deputies to detain that person." Dkt, 64-5 at 27. Viewed in Ellis's favor, this assertion is flatly inconsistent with Redding's other assertion that he intended for Zepp to merely search for Ellis, not bite her. And again, factual questions exist as to whether any bottle in Ellis's possession posed an immediate threat to the safety of Redding or any other deputy. Moreover, factual question also exists as to whether a reasonable officer would have even feared that Ellis possessed a bottle when Zepp was biting her. While Zepp was biting and pulling on Ellis's left arm, Ellis was attempting to fend off Zepp with her right hand. *See* Dkt. 16 at 35–37; Dkt. 69, ¶ 5; Dkt. 64-4 at 5. A reasonable jury could find that, under these circumstances, both of Ellis's hands were occupied and, therefore, it was objectively unreasonable for Redding to believe that Ellis possessed anything in either of her hands.

For these reasons, genuine issues of material fact exist as to whether Ellis posed an immediate threat to the officers' or anyone else's safety.

**2.      Genuine issues of material fact exist as to whether the severity of the crimes at issue warranted the use of police canine to bite and hold Ellis.**

A fact issue also exists as to whether the severity of the crimes at issue warranted Redding's use of a police canine to bite and hold Ellis. The deputies suspected that Ellis had committed two counts of assault in the fourth degree, domestic violence, which is a

gross misdemeanor. Dkt. 80-7 at 14; *see also* RCW 9A.36.041 (stating that assault in the fourth degree is generally a gross misdemeanor). Haney's incident report described the injuries sustained by both Vankirk and Devon as "Apparent Minor Injury/Complaint of Minor Pain." Dkt. 67-1 at 4–5. The report also states that Vankirk and his son had "redness on their left eyes" and "some redness that looked . . . to be a fresh markings [sic]." *Id.* at 6. Moreover, a reasonable jury could find that the photographs that Haney took of Vankirk and Devon display no visible injuries. *See* Dkt. 16 at 29–34; Dkt. 80-7 at 7–8. Considering this evidence, a factual question exists as to whether the offenses at issue were severe enough to warrant the use of a police canine to bite, hold, and pull on Ellis.

Redding argues that the "deputies had probable cause for the violent 'crime at issue' of assault and battery during domestic abuse which the legislature deems such a severe crime that it *mandates* a search for, and arrest of, the domestic abuser." Dkt. 72 at 14. It is true that, in Washington, "[w]hen a peace officer responds to a domestic violence call and has probable cause to believe that a crime has been committed, the peace officer shall exercise arrest powers with reference to the criteria in RCW 10.31.100." RCW 10.99.030(2)(a). However, this statute does not authorize a police officer to effect an arrest by any means necessary. Rather, in effecting an arrest pursuant to this state statute, an officer indisputably remains subject to the mandates of the Fourth Amendment. *See* U.S. Const. Art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land."). Therefore, this state statutory duty is, at best, marginally relevant to Ellis's excessive

force claim. To the extent Redding asserts that it controls over the Constitution, he is wrong.

For these reasons, genuine issues of material fact exist as to whether the severity of the crimes warranted the use of a police canine to bite, hold, and pull on Ellis.

**3.    Genuine issues of material fact exist as to whether Ellis posed a risk of flight.**

A fact issue further exists as to whether Ellis posed a risk of flight. In a supplemental police report, Redding explained why he decided to deploy Zepp:

> Due to the probable cause to arrest for two counts of assault, the fact that on prior incidents she returned to the residence, I decided to use K9-Zepp in an attempt to locate Jenni. I believed that if not found and apprehended Jenni would come back to the residence and possibly further assault the victims. Please note that it was substantially raining at the time and Jenni's clothing description was not suitable for the weather which only added to my belief she would return.

Dkt. 16 at 19.

As explained in the Court's prior orders, the supplemental police report indicates that Redding deployed Zepp "'because he believed that [Ellis] would return to the residence and, considering her dress and weather conditions, it would not likely have been a long wait.'" Dkt. 40 at 14 (quoting Dkt. 34 at 17). Viewed in the light most favorable to Ellis, her clothing and the weather conditions are evidence that she did not present a legitimate risk of flight and, instead, would have returned to the residence shortly. Redding concedes as much.

The Court is cognizant that "officers 'need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that

1    range of conduct we identify as reasonable.'" *Hughes v. Kisela*, 841 F.3d 1081, 1087 (9th

2    Cir. 2016), *rev'd on other grounds*, *Kisela v. Hughes*, 584 U.S. __, 138 S. Ct. 1148

3    (2018) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). Nevertheless, "police

4    are required to consider [w]hat other tactics if any were available, and whether there are

5    clear, reasonable and less intrusive alternatives to the force being contemplated." *Hughes*,

6    841 F.3d at 1087, *rev'd on other grounds*, *Kisela*, 138 S. Ct. 1148 (internal quotation

7    marks omitted) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010)). A

8    reasonable jury could find that, under the circumstances, a clear, reasonable, and less

9    intrusive alternative to using a police canine to search for Ellis was to have simply waited

10   for her to return to the residence.

11          Redding contends that neither he nor any other deputy could have waited for Ellis

12   to return to the residence because "Ellis after a previous flight on foot from police in

13   similar clothing in the dark of a similar March night had waited far *more* than four hours

14   before returning to attack again." Dkt. 72 at 11. But he does not cite any evidence

15   showing that Redding knew this particular information when he deployed Zepp. *See S.R.*

16   *Nehad*, 929 F.3d at 1132 ("Only information known to the officer at the time the conduct

17   occurred is relevant" to an excessive force claim under the Fourth Amendment). But even

18   if he did, the trier of fact must determine the significance of any such evidence.

19          Redding also asserts that the "[d]eputies could not continue to stake out the house

20   until Ellis might return several hours later since the Department did not have the

21   manpower to further keep them from their patrol duties." Dkt. 72 at 11. In support of this

22   assertion, Redding quotes the following language from a judicial opinion in different case

before a different court: "[A] 2018 staffing assessment determined the department had 40 fewer deputies than the audits recommended to patrol the county," that "staffing 'present[ed] challenges to organizational effectiveness and create[d] a higher level of risk liability,'" and "there are simply not enough of them assigned to the patrol function." *Estate of McCartney by & through McCartney v. Pierce Cnty.*, 22 Wn. App. 2d 665, 671, *review denied sub nom. Est. of McCartney v. Pierce Cnty.*, 200 Wn.2d 1014 (2022). Evidence that is merely summarized in a judicial opinion in a different case does not qualify as evidence presented in this case. In any event, the credibility and weight of this explanation, if supported by proper evidence, presents a factual question for the jury.

Finally, even if Ellis attempted to evade arrest by flight *before* Zepp located her, genuine issues of material fact remain as to whether she was actively resisting arrest or attempting to evade arrest *after* Zepp had already located her. After Zepp initially located and bit Ellis, Redding allowed Zepp to continue biting her. Dkt. 64-5 at 23. Zepp was biting and pulling on Ellis's left arm while Ellis was attempting to fend off Zepp with her right hand. *See* Dkt. 16 at 35–37; Dkt. 69, ¶ 5; Dkt. 64-4 at 5. Observing this, Redding "repeated[ly] command[ed]" Ellis "to let go of []Zepp and show [him] her hands," but "she did not comply." Dkt. 69, ¶ 5. A fact issue exists as to whether a reasonable officer would have believed that Ellis did not comply with these commands simply because she was recoiling from Zepp's continuous biting and attempting to protect herself from sustaining further injuries. A reasonable jury could find that, under these circumstances, Ellis did not pose any risk of flight and Redding improperly encouraged Zepp to continue

1   biting her despite both of her hands having been clearly visible. *See Watkins v. City of*

2   *Oakland*, 145 F.3d 1087, 1090, 1093 (9th Cir. 1998).

3       For all these reasons, genuine issues of material fact exist as to whether Redding

4   violated Ellis's Fourth Amendment right to be free from unreasonable seizure.

5   **D.   Redding is not entitled to qualified immunity on summary judgment.**

6       The Court next addresses whether Redding is qualifiedly immune from Ellis's

7   excessive force claim.

8       Redding asserts that he is entitled to qualified immunity because it was not clearly

9   established that "using a *leashed* K-9 to search outside for a violent uncooperating

10  suspect evading police, or the spontaneous uncommanded and unseen biting of that

11  suspect when suddenly found by a K9 where she was not expected to be, or the handler's

12  ensuring the suspect's hands no longer contained a weapon" amounted to excessive force.

13  Dkt. 72 at 24.

14      Ellis responds that the facts in this case are similar to those in the Ninth Circuit's

15  1998 decision in *Watkins* wherein the court held that an officer's improper

16  encouragement of the continuation of a dog biting a suspected burglar who was hiding in

17  a car amounted to a violation of a clearly established right. Dkt. 82 at 23–24. Ellis asserts

18  that "Redding not only prolonged [] Zepp biting [her], but actually dragged [her] by the

19  arm out from underneath the trailer while [] Zepp was still attached to her arm,

20  unnecessarily further inflicting injury to her arm." *Id.* at 24.

21      Under the qualified immunity doctrine, "government officials performing

22  discretionary functions generally are shielded from liability for civil damages insofar as

1   their conduct does not violate clearly established statutory or constitutional rights of

2   which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818

3   (1982). The doctrine "protect[s] officers from the sometimes 'hazy border' between

4   excessive and acceptable force." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)

5   (parenthetically quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

6          For a right to be clearly established, "[t]he contours of the right must be

7   sufficiently clear that a reasonable official would understand that what he is doing

8   violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Although this does

9   "not require a case directly on point, . . . existing precedent must have placed the

10   statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731,

11   741 (2011). This Court has already ruled in its order denying Redding's first motion to

12   dismiss that "Ninth Circuit precedent clearly establishes that police officers use excessive

13   force when they deploy a canine to bite a suspect who neither poses a threat of harm nor

14   attempts to evade or resist arrest." Dkt. 34 at 8 (citing *Watkins*, 145 F.3d at 1093;

15   *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994)). Because fact issues exist as to

16   whether Ellis posed a threat of harm and attempted to evade or resist arrest, Redding is

17   not entitled to qualified immunity on summary judgment.

18          Moreover, viewed in Ellis's favor, the facts in this case are strikingly similar to

19   those in *Watkins*. In that case, a police officer deployed a canine, Nero, to search for a

20   suspected burglar, Watkins. 145 F.3d at 1090. The officer announced two warnings

21   before releasing Nero, but "Watkins did not surrender to the police and claims that he did

22   not hear the announcement." *Id.* The officer then released Nero, who "ran out of sight of

1    [the officer], located Watkins who was hiding in a car, and bit him." *Id.* Notably, "[u]pon

2    arriving at the scene, [the officer] did not call Nero off of Watkins; instead, he ordered

3    Watkins to show his hands." *Id.* "Watkins, who was recoiling from the dog's bite, failed

4    to comply." *Id.* The officer "then pulled Watkins out of the car onto the ground" and

5    "Nero continued to bite until Watkins complied with [the officer]'s orders to show his

6    hands." *Id.* "[A]bout thirty seconds" elapsed between the time the officer ordered

7    Watkins to show his hands and the time Watkins complied with that order. *Id.*

8        The Ninth Circuit held that the officer was not qualifiedly immune from Watkins's

9    excessive force claim on summary judgment. *Watkins*, 145 F.3d at 1093. The court

10   reasoned that "it was clearly established that excessive duration of the bite and improper

11   encouragement of a continuation of the attack by officers could constitute excessive force

12   that would be a constitutional violation." *Id.*

13       Viewing the evidence in the light most favorable to Ellis, Zepp continued to bite

14   Ellis for an excessive duration and Redding improperly encouraged the continuation of

15   the attack. Again, there is evidence that Redding allowed Zepp to continue biting Ellis

16   when she neither posed a threat of harm nor attempted to evade or resist arrest. As

17   explained, a fact issue exists as to whether Ellis posed any threat to the deputies' safety

18   after Zepp had already located her. Redding nevertheless allowed Zepp to continue biting

19   Ellis, "repeated[ly] command[ing]" Ellis "to let go of []Zepp and show [Redding] her

20   hands." Dkt. 69, ¶ 5. Ellis, who was recoiling from Zepp's biting and attempting to fend

21   off Zepp, did not comply. *Id.*; Dkt. 64-4 at 5. Redding testified that, "while [Ellis] was

22   distracted by []Zepp, [Redding] grabbed [Ellis]'s arm and pulled her out from beneath the

1   boat and was assisted in this by []Zepp who spontaneously helped pull her out in the

2   same direction." Dkt. 69, ¶ 5. Ellis testified that Zepp "clearly had a huge grip and was . .

3   . tearing, like a ripping motion because [Zepp] was dragging" her. Dkt. 64-7 at 20.

4   Sometime thereafter, Redding claims to have determined that Ellis's hands were empty,

5   so he straddled Zepp, grabbed the harness, and commanded Zepp to release Ellis. Dkt.

6   69, ¶ 5. Approximately 25 to 30 seconds elapsed between the time Redding first reported

7   to the other deputies that Zepp was biting Ellis and the time Redding ultimately removed

8   Zepp from her. *See* Dkt. 65, ¶ 4. Viewed in Ellis's favor, this conduct amounts to a

9   violation of a clearly established right. *See* Watkins, 145 F.3d at 1090, 1093.

10      For these reasons, factual issues prevent a summary judgment determination that

11   Redding is qualifiedly immune from Ellis's excessive force claim. Redding's motion for

12   summary judgment on this claim is accordingly **DENIED**.

13   **E.   Genuine issues of material fact prevent summary judgment dismissal of
        Ellis's negligence and vicarious liability claims.**

14

15      This is Redding's third motion for summary judgment on Ellis's negligence claim.

16   *See* Dkts. 20, 36, 72. It is Pierce County's second motion for summary judgment on the

     vicarious liability claim. *See* Dkts. 36, 72. They argue, for the third time, that Redding is

17   immune from this claim under a Washington statute that provides immunity to dog

18   handlers who use police dogs in the line of duty in good faith from civil actions arising

19   out of the use of such dog. Dkt. 72 at 10–11, 25. This is so, they claim, because

20   intervening deposition testimony from Vankirk shows that there is no longer a factual

21   dispute as to whether Redding deployed Zepp in good faith. *Id.* at 10. They also contend

22

1   that Redding used Zepp in good faith because he initially intended for Zepp to merely

2   search for and locate Ellis. *Id.* at 10–11.

3      Ellis maintains that Vankirk's testimony that "the police were intent on 'teaching

4   Jenni a lesson that night'" raises a fact issue as to whether Redding used Zepp in good

5   faith. Dkt. 82 at 24–25.

6      Washington police officers have a "duty to act reasonably in carrying out law

7   enforcement functions." *Beltran-Serrano v. City of Tacoma*, 193 Wn.2d 537, 545 (2019).

8   As related to police dog bites, the Washington Supreme Court has held that "'a

9   negligence cause of action arises where there is ineffective control of an animal in a

10  situation where it would reasonably be expected that injury could occur, and injury does

11  proximately result from the negligence.'" *Finch v. Thurston Cnty.*, 186 Wn.2d 744, 752

12  (2016) (quoting *Arnold v. Laird*, 94 Wn.2d 867, 871 (1980)). In Washington, "[a]ny dog

13  handler who uses a police dog in the line of duty in good faith is immune from civil

14  action for damages arising out of such use of the police dog or accelerant detection dog."

15  RCW 4.24.410(2). Under this statute, "'[p]olice dog' means a dog used by a law

16  enforcement agency specially trained for law enforcement work *and under the control of*

17  *a dog handler*." RCW 4.24.410(1)(a) (emphasis added). Moreover, "[t]he standard

18  definition of good faith is a state of mind indicating honesty and lawfulness of purpose."

19  *Whaley v. State Dep't of Soc. & Health Servs.*, 90 Wn. App. 658, 669 (1998).

20     For at least three reasons, genuine issues of material fact prevent summary

21  judgment dismissal of Ellis's negligence claim. First, Redding's own testimony raises a

22  fact issue as to whether he is entitled to immunity under RCW 4.24.410(2) and whether

1   he negligently handled Zepp. Redding's declaration states: "[T]he first time I saw

2   Plaintiff or knew of her location was when []Zepp, without having been given a

3   command to do so, darted out of my sight and I ran around the corner of a line of

4   arborvitaes that bordered Vankirk's property to find Ellis hiding under a boat in the dark

5   next to the vegetation while being contacted by []Zepp." Dkt. 69, ¶ 3.

6       To be entitled to immunity under RCW 4.24.410(2), Redding must establish that

7   he used a "police dog," which, in turn, requires Redding to show that the dog was "under

8   the control of the dog handler." RCW 4.24.410(1)(a). Redding's own testimony raises a

9   fact question as to whether Zepp was under his control when Zepp bit Ellis. *See Clauson

10  v. Thurston Cnty. by and through Thurston Cnty. Sheriff's Office*, 2023 WL 8369473, at

11  *6 (W.D.Wash., 2023) (police officer not entitled to immunity under RCW 4.24.410(2)

12  because a fact issue existed as to whether the officer had "effective control over his dog"

13  because "there [was] a chance that the dog bit [the plaintiff] without [the officer]'s

14  knowledge"). This same testimony also raises a fact question as to whether Redding

15  negligently handled Zepp and, as a result, caused Ellis's injuries. For these reasons alone,

16  Redding's motion to dismiss the negligence claim is denied.

17      Second, and as explained in the Court's prior orders, "the evidence indicates that

18  Redding deployed the canine to 'teach Jenni a lesson.'" Dkt. 40 at 13–14 (quoting Dkt.

19  34 at 16). In a declaration filed in opposition to Redding's first motion for summary

20  judgment, Vankirk states, "[W]hen I pressed the police about why they were so intent on

21  deploying the K-9 . . . , I was told that the K-9 was being deployed to teach Jenni a

22  lesson." Dkt. 29, ¶ 5. Redding and Pierce County assert that, since Ellis filed that

1  declaration, "Vankirk testified he did not recall ever seeing Deputy Redding and the

2  'teach Jenni a lesson' statement was made by *Deputy Wolfe* when *alone with Vankirk* in

3  the house while *the other deputies where* [sic] *outside tracking Ellis*." Dkt. 72 at 10. They

4  also contend that this statement "did not concern Zepp's deployment or a potential use of

5  force but concerned Vankirk deterring Ellis from her cycle of abuse by cooperating with

6  her prosecution under the law." *Id.*

7          During his deposition, Vankirk testified as follows:

8          A.      . . . . You know. I mean, to be fair, I remember word-for-word
        one of them said, you know, "This time, we are going to teach her a
9        lesson." Those words definitely came out of somebody, but.
        Q.      Did anyone say "teach her a lesson --" and this is before the
10       K-9 officer came?
        A.      Yes.
11       Q.      Did any of the -- do you remember who said that?
        A.      I couldn't tell you. I can't. I mean, one of the officers was
12       kind of in contact with me more.
        Q.      Is that Wolfe?
13       A.      I think so. Yeah. That probably was him.
        Q.      Okay. When -- did -- at any time, did they say "teach her a
14       lesson with the dog"?
        A.      No.
15       Q.      Or teach her –
        A.      No. That was never.
16       Q.      "We'll just teach her a lesson as far as arrest her, prosecute
        her," the criminal justice type of teach her a lesson?
17       A.      Correct.

18  Dkt. 64-2 at 22–23.

19          The exact meaning of Wolfe's statement, "[t]his time, we are going to teach her a

20  lesson," Dkt. 64-2 at 22, is not for Vankirk to decide. It is for the trier of fact. Under the

21  circumstances of this case, a fact issue exists as to whether this statement indicates, on

22  the one hand, a plan to use a police canine for an improper purpose or, on the other hand,

an intent to merely arrest Ellis and have her prosecuted.[8] It is also of no consequence that Wolfe—not Redding—made this statement. Viewed in the light most favorable to Ellis, the statement itself indicates that Wolfe had personal knowledge of a plan to use Zepp for an improper purpose. For these reasons, too, factual issues exist as to whether Redding used Zepp in good faith.

Finally, viewed in the light most favorable to Ellis, Redding's statements in his supplemental police report, Dkt. 16 at 19, indicate that he did not use Zepp in good faith. As explained, these statements indicate that Redding deployed Zepp "'because he believed that [Ellis] would return to the residence and, considering her dress and weather conditions, it would not likely have been a long wait.'" Dkt. 40 at 14 (quoting Dkt. 34 at 17). Because "Redding did not provide *any* explanation in this report as to why he" or another deputy "could not have simply waited for Ellis to return home before apprehending her," his explanation for deploying Zepp "indicates a lack of both honesty and lawfulness in purpose." Dkt. 40 at 14.

The Court notes that plaintiffs are entitled to assert claims of excessive force and negligence in the alternative. *See Beltran-Serrano*, 193 Wn.2d at 560. However, under the unique facts of this case, Ellis's excessive force and negligence claims need not be

---

[8] To the extent that Wolfe's statement indicates that Redding deployed Zepp to intentionally bite and hold Ellis, it does not support a negligence claim. *See Willard v. City of Everett*, No. C12-14 TSZ, 2013 WL 4759064, at *2 (W.D. Wash. Sept. 4, 2013), *aff'd*, 637 F. App'x 441 (9th Cir. 2016) ("A plaintiff may not base a claim of negligence on an intentional act, like the use of excessive force."); *accord Boyles v. City of Kennewick*, 62 Wn. App. 174, 177–78 (1991) (allegations of excessive force do not constitute negligence). However, as explained in the Court's prior order, to the extent this statement indicates that Redding used Zepp for some other improper purpose (such as to merely frighten Ellis), it raises a fact issue as to whether Redding used Zepp in good faith. *See* Dkt. 40 at 14 n.5.

asserted in the alternative. "Under *Beltran-Serrano*, a plaintiff may not base a claim of negligence on an intentional act, like the use of excessive force, *but may sue for '*negligent acts leading up to the ultimate use of force.'*" *Briscoe v. City of Seattle*, 483 F. Supp. 3d 999, 1014 n.15 (W.D. Wash. 2020) (emphasis added) (quoting *Beltran-Serrano*, 193 Wn.2d at 546). Viewed in the light most favorable to Ellis, Redding's own testimony indicates that he did not have effective control over Zepp when Zepp initially bit Ellis. *See* Dkt. 69, ¶ 3. This evidence supports the negligence claim. Separately, fact issues exist as to whether Redding violated Ellis's Fourth Amendment right to be free from unreasonable seizure *after* Zepp initially bit Ellis. Accordingly, Ellis's negligence claim and excessive force claim need not be asserted in the alternative.

For all these reasons, genuine issues of material fact prevent summary judgment dismissal of Ellis's negligence and vicarious liability claims. Redding and Pierce County's motion for summary judgment on these claims is accordingly **DENIED**.

**F.   Ellis's motion for partial summary judgment.**

Ellis moves for a summary judgment determination that: (1) her "dog bite injuries were caused by the March 12, 2019 attack by [] Zepp," (2) "the emergency medical treatment for [her] bite injuries was reasonable and necessary," (3) her "medical expenses for her emergency medical treatment were reasonable and customary for the type of treatment provided," and (4) "defendants [d]o not have any evidence to support" an "affirmative defense of 'provocation.'" Dkt. 73 at 1.

Redding and Pierce County do not dispute that (1) Ellis was "bitten and held by []Zepp on March 12, 2019," (2) "the March 12, 2019 emergency room treatment

immediately thereafter [was] reasonable and customary," and (3) "the March 12, 2019 [emergency room] medical expense [was] reasonable and customary for the type of treatment provided." Dkt. 78 at 9. To this extent, therefore, Ellis's motion is **GRANTED**.

However, Redding and Pierce County object to Court ruling as a matter of law that Zepp "attacked" Ellis. The Court agrees and, to the extent Ellis's motion seeks such a ruling, it is **DENIED**.

Redding and Pierce County also object to Ellis's motion insofar as it seeks a ruling that their provocation defense to her negligence claim fails as a matter of law. This is so, they claim, because genuine issues of material fact exist as to whether Ellis provoked Zepp, causing Zepp to bite her. Dkt. 78 at 8.

The affirmative defense at issue, which is codified in RCW 16.080.060, provides that "[p]oof of provocation of the attack by the injured person shall be a complete defense to an action for damages." This defense, which was enacted by the Washington legislature in 1941, was the third and final section of a statute establishing that dog owners are generally strictly liable for damages resulting from their dogs biting another person. *See* LAWS OF 1941, ch. 77 § 1. The first section of this statute, now codified as RCW 16.080.040(1), provides:

> The owner of any dog which shall bite any person while such person is in or on a public place or lawfully in or on a private place including the property of the owner of such dog, shall be liable for such damages as may be suffered by the person bitten, regardless of the former viciousness of such dog or the owner's knowledge of such viciousness.

As Redding and Pierce County concede, "a statutory strict liability claim under RCW 16.08.040 . . . was not plead [sic] in the complaint or the answer and is not a cause

1   of action here."[9] Dkt. 78 at 6–7; *see also* Dkt. 35. As a matter of law, Redding and Pierce

2   County are not entitled to assert a "provocation" defense under RCW 16.080.060 in

3   response to Ellis's negligence claim. Therefore, Ellis's motion for summary judgment on

4   the provocation defense is **GRANTED**.

5         Finally, in their response brief to Ellis's motion for partial summary judgment,

6   Redding and Pierce County request a ruling that Ellis's "claims for future medical

7   treatment, permanent injuries, and past and future loss of income" fail as a matter of law.

8   Dkt. 78 at 6. Under the local rules, "[a] party filing a cross motion must note it in

9   accordance with local rules." Local Rules, W.D. Wash. LCR 7(k). Redding and Pierce

10   County did not properly file their request as a cross motion for partial summary judgment

11   or note it accordingly. *See MacLay v. M/V SAHARA*, 926 F. Supp. 2d 1209, 1219 (W.D.

12   Wash. 2013). The request is also untimely; Redding and Pierce County filed it on January

13   8, 2024, Dkt. 78, and the deadline to file dispositive motions was December 20, 2023.

14   Dkt. 47. Because the cross motion fails to comply with both the local rules and the case

15   schedule, it is **DENIED**.

16         Accordingly, Ellis's motion for partial summary judgment is **GRANTED in part**

17   and **DENIED in part**. The motion is **DENIED** insofar as Ellis seeks a summary

18   judgment ruling that Zepp "attacked" her. In all other respects, it is **GRANTED**.

19

20       [9] Redding and Pierce County also assert that the strict liability dog bite statute "'does not apply to the lawful application of a police dog, as defined in RCW 4.24.410.'" Dkt. 78 at 7

21   (quoting RCW 16.08.040). Again, the definition of "police dog" under the cited statute requires the dog to be "under the control of a dog handler." RCW 4.24.410(1)(a). Nevertheless, because Ellis does not advance a strict liability claim in this case, the Court expresses no opinion as to

22   whether such a claim would survive summary judgment.

1

### III.  ORDER

2          Therefore, Redding and Pierce County's motion for summary judgment, Dkt. 72,

3    is **DENIED**. Ellis's motion for partial summary judgment, Dkt. 73, is **GRANTED in**

4    **part** and **DENIED in part**. Redding and Pierce County's improper cross motion for

5    partial summary judgment, Dkt. 78 at 3–6, is **DENIED**.

6          **IT IS SO ORDERED**.

7          Dated this 9th day of February, 2024.

8

9                                                          _____

10                                                         BENJAMIN H. SETTLE
                                                           United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22